UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| LAVONTA CHURCHWELL, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 3:17-cv-00916 |
| | ) | |
| JONATHAN LEBO, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

# **MEMORANDUM OPINION**

Lavonta Churchwell is currently serving an effective sentence of life in prison based on his 2010 conviction by a Davidson County, Tennessee jury of two counts of felony murder, two counts of especially aggravated robbery, and two counts of criminally negligent homicide. On June 5, 2017, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Respondent filed his answer to the petition (Doc. No. 19) and the state court record. (Doc. No. 17.)

This matter is ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that the petition is timely, that this is Petitioner's first § 2254 petition related to these convictions, and that the claims presented are at least technically exhausted. (Doc. No. 19 at 1–2.)

Having reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under § 2254, and his petition will therefore be denied.

**I. Procedural History**

Petitioner was indicted on February 3, 2009, on two counts of first-degree premeditated murder, two counts of first-degree felony murder committed during an attempt to perpetrate a robbery, and two counts of especially aggravated robbery. (Doc. No. 17-1 at 3–10.) Petitioner proceeded to trial on those charges, and a jury convicted him of two counts of first-degree felony murder, two counts of especially aggravated robbery, and two counts of criminally negligent homicide as a lesser included offense of first-degree premeditated murder. (Id. at 37–43.) The trial court merged the convictions for criminally negligent homicide into the convictions for felony murder (id. at 38, 40) and imposed sentences of life imprisonment for the felony murder convictions. (Id. at 39, 41.) It imposed twenty-year sentences for the aggravated robbery convictions (id. at 42–43), to run concurrently with the life sentences.

On direct appeal, Petitioner argued that: (1) the evidence at trial was insufficient to allow any rational juror to conclude that he was guilty beyond a reasonable doubt; (2) the evidence was insufficient because it failed to corroborate his alleged jailhouse confessions; and (3) the trial court erred in allowing testimony regarding alleged threats he made against a jailhouse informant and the subsequent attack on that informant. (Doc. No. 17-11 at 4.) The Tennessee Court of Criminal Appeals rejected these arguments and affirmed Petitioner's convictions. State v. Churchwell, No. M2011-00950-CCA-R3-CD, 2013 WL 430118, at *1 (Tenn. Crim. App. Feb. 4, 2013). The Tennessee Supreme Court denied discretionary review on June 12, 2013. (Doc. No. 17-15.)

Petitioner timely filed a pro se petition for post-conviction relief on November 12, 2013. (Doc. No. 17-16 at 39–59.) The state court appointed counsel for Petitioner, who filed an amended petition. (Id. at 71–76.) Following an evidentiary hearing, the post-conviction court denied relief. (Id. at 79–82.) On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of the

post-conviction petition, rejecting Petitioner's arguments that trial counsel was ineffective in failing to communicate with Petitioner or provide him with discovery, and in failing to interview a key alibi witness. Churchwell v. State, No. M2015-01567-CCA-R3-PC, 2016 WL 5253203, at *1, 3 (Tenn. Crim. App. Sept. 21, 2016). The Tennessee Supreme Court denied Petitioner's application for permission to appeal on January 19, 2017. (Doc. No. 17-30.)

Petitioner filed his pro se petition in this Court on June 5, 2017. (Doc. No. 1.)

**II. Statement of Facts**

Dr. Pierre Robert Colas was a professor at Vanderbilt University and his sister Marie Colas was visiting from Germany when the two were killed inside Dr. Colas's East Nashville home, on August 26, 2008. State v. Churchwell, 2013 WL 430118, at *1. Just days prior to their deaths, Dr. Sergio Romero, a friend and colleague of Dr. Colas, had moved into Dr. Colas's house. Id. Dr. Romero testified at Petitioner's trial that a few days prior to the killings, he had seen two people looking through the kitchen window of Dr. Colas's home. Id. He asked the two people what they were doing, and they "turned around and said, [s]hut up, [b]itch," and walked to their car parked across the street, got in, and drove away. Id. Dr. Romero did not call the police. Id.

On the evening of August 28, 2008, Dr. Romero was away from the home at a faculty meeting until 8:00 p.m. Id. When he returned, Dr. Romero walked upstairs to watch a show on his computer. Id. Approximately ten or fifteen minutes later, he heard people "talking and walking inside of the house." Id. Dr. Romero then heard Dr. Colas scream, and he heard a gunshot. Id. Dr. Romero then called 911. Id.

The police officers who responded to the 911 call testified as follows regarding what they found at the scene:

> Officer Shane Fairbanks, of the Metropolitan Nashville Police Department, responded to the 911 call made by Dr. Romero. Officer Fairbanks testified that

when he entered the home, he saw the victims lying on the floor in a pool of blood. Robert Colas was wearing only a pair of shorts, and Marie Colas was wearing only underwear. She was lying across Robert Colas' legs. Officer Fairbanks testified that Ms. Colas "was moaning, making noises, nothing coherent, but making noises, moaning." Dr. Colas was not making any sounds at all, and Officer Fairbanks "wasn't sure if he was still alive or not." Officers searched the rest of the house and found Dr. Romero upstairs. They brought Dr. Romero downstairs, and Dr. Romero saw Marie Colas covered in blood and wailing. Paramedics arrived and took Marie Colas away in an ambulance. Dr. Colas died at the scene, and Marie Colas died on August 31, 2008.

Officer George Bouton, of the Metro Nashville Police Department, also responded to the scene. He testified that upon entering the residence, he observed a rug on the floor that was "tipped back almost folded over," and Dr. Colas's body was lying to the right of the front door in a foyer area. Officer Bouton saw a "pile of clothing" in the living room. He testified there was blood on the floor and on the walls. Officer Bouton began taking photographs of the crime scene. He testified that he was unable to lift any identifiable latent prints from the crime scene. Officer Bouton found a pair of latex gloves near the victims' bodies, which TBI crime lab testing revealed had George Cody's DNA on them. Cody's DNA was also found on the handgun that was determined to have been the murder weapon.

Id. at *2. Autopsies of Dr. Colas and Marie Colas revealed that they both died of gunshot wounds to the head, and that the manner of their deaths was homicide. Id.

Nashville Police Detective Matthew Filter was assigned to investigate the Colas murders. Id. He testified that a cartridge casing found near Dr. Colas's body indicated that the murder weapon was a semi-automatic handgun. Id. He further testified that the victims' credit cards and IDs had been taken and used at a Walmart in Madison, Tennessee, within three hours of the murders. Id. The store's surveillance video confirmed that George Cody, Thomas Reed, and Michael Holloway had made purchases with the victims' credit cards. Id. Investigators subsequently determined that Reed and Holloway were not involved in the murders, as they both had verified alibis. Id. Cody was located and taken into custody within a few days. Id. Officers "obtained a search warrant for [Cody's] house, located only a few blocks from the crime scene, and recovered the victims' credit cards and IDs and two firearms, including a .22 revolver and a

4

.380 caliber semi-automatic handgun. Ballistics testing concluded that the bullets recovered from the victims' bodies were fired from the semi-automatic handgun." Id.

Petitioner was subsequently identified and investigated as a suspect, along with Nathaniel Carson. Id. at *3. During an interview with Detective Filter on September 8, 2008, Petitioner maintained that he was in Antioch, Tennessee on the date of the murders. Id. However, when confronted with cell phone records showing his location at the time of the murders, Petitioner admitted that he had been in East Nashville but claimed that he was at his grandmother's house.[1] Id. Detective Filter testified that details of the crime scene and the investigation were not released to the media or public during the investigation. Id.

Following Petitioner's arrest, he shared a cell with Andrew Jones, through whom the following evidence came to light:

> After being incarcerated together for about a week, Defendant asked Jones whether Defendant's fingerprints would still be present if he had shot someone and then handed the gun to another person. He also asked whether his fingerprints would remain on credit cards for several months and why blood might come from someone's mouth and nose after shooting them in the body. Defendant told Jones about "the white boys" who used the victims' credit cards. Defendant told Jones that George Cody and his girlfriend had accused him of the crimes but that there was no evidence to place Defendant at the crime scene. Defendant told Jones about two potential alibis that he was going to use. Defendant admitted to Jones that he had committed the murders. Defendant and Jones got into an argument, and Jones expressed doubt about Defendant's involvement in the crimes. Defendant replied, "I killed the fucking professor, and I'm glad because he got me put here."

Id. Petitioner also confessed to the murders to another fellow inmate, Jermaine Jenkins. Id. Petitioner and Jenkins lived in the same pod during 2009, and both were facing felony murder charges. Id. Jenkins testified as follows:

---

[1] At the post-conviction evidentiary hearing, Petitioner testified that on the night of August 26, 2008, he was in the back yard of his cousin Nathan Carson's home, which was just around the corner from Dr. Colas's house. Churchwell v. State, 2016 WL 5253203, at *2.

> He testified that Defendant told him that he committed the murders in this case. Defendant told Jenkins that he and his brother "Shorty" and George Cody had planned to rob Dr. Colas as part of a "gang initiation." Defendant described the victim's house to Jenkins. He told Jenkins that they took the victim's cash and credit cards and that Cody kept the credit cards and the murder weapon. Defendant expressed concern that his fingerprints might be on the gun. He told Jenkins that he intended to give an alibi "that he was on the phone at the time, then he switched his statement saying that he was riding around at the time." Defendant also told Jenkins that they recruited two white males to use the victim's credit cards "to throw off the case." Jenkins was particularly troubled by Defendant's description of the victims' bodies, testifying, "he kept talking about the brains being blown out." He testified that Defendant had expressed concern that his fingerprints were on the murder weapon.
>
> Jenkins testified that he overheard an argument between Defendant and inmate Andrew Jones. He heard Defendant say, "yeah, I killed the motherfuckers. Yeah, I killed the white motherfuckers." Jenkins later told Defendant, "[y]ou talk too much, everybody heard you." Jenkins testified that another inmate, Maurice Boyd, became aware of Defendant's involvement in the murders and began questioning Defendant about it. Defendant told Jenkins that "he was going to have Maurice fucked up." Jenkins testified that on the day following Defendant's confrontation with Jones, Defendant was moved to a different floor. Jenkins subsequently learned that Boyd was stabbed while in custody. Jenkins saw Defendant again approximately two months later, and Defendant stated that "he had shot the kite up to his brother[,]" Shorty, which meant that Defendant sent a letter to his brother inside the jail stating that Boyd had "been handled." Maurice Boyd had been interviewed by investigators regarding the Colas' murders prior to being stabbed.

Id. at *3–4.

Petitioner testified in his own defense at trial, denying any involvement in the murders and denying that he told Jones or Jenkins otherwise. Id. at *4.

### III. Issues Presented for Review

The Court construes Petitioner's pro se petition under 28 U.S.C. § 2254 to raise the following claims:

(1) The evidence at trial was insufficient to sustain his convictions;

(2) The Tennessee Court of Criminal Appeals applied the wrong standard to his claims of ineffective assistance of counsel, requiring him to establish counsel's deficiency by clear and

6

convincing evidence rather than determining whether a reasonable probability existed that the result of his trial would have been different in the absence of the deficiency;

(3) Trial counsel was ineffective in failing to make a contemporaneous objection to the testimony of fellow inmates Andrew Jones and Jermaine Jenkins; and

(4) Trial counsel was ineffective in failing to move for a mistrial based on the jury's finding that he is guilty of both felony murder and criminally negligent homicide, which Petitioner claims are mutually exclusive, legally inconsistent verdicts.

(Doc. No. 1 at 4–20; see Doc. No. 19 at 9.)

**IV. Legal Standard**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Peterson v. Warren, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained,

7

AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102–03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. Id. at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. Id. at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather,

the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read Matthews to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Richter, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner bears the burden of proof. Pinholster, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal

9

habeas court to the state courts. Cullen v. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, Rose v. Lundy, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. Picard v. Connor, 404 U.S. 270 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 81–82 (1977); see also Walker v. Martin, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); Coleman v. Thompson, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." Id. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see also Ambrose v. Booker, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392

(2004) (citing Murray v. Carrier, 477 U.S. 478, 495–96 (1986)); accord Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006).

## V. Analysis

### A. Sufficiency of the Evidence

Petitioner claims that the evidence at his trial did not support his convictions. (Doc. No. 1 at 5.) He states that "[n]one of the State's evidence pointed directly or circumstantially to the petitioner, but to George Cody[:] (1) Cody's DNA and latex gloves were found at the crime scene, (2) Cody was found with the murder weapon, (3) Cody's DNA was found on the handgun and not the petitioner's, (4) Surveillance video from Wal-Mart in Madison, Tennessee revealed Cody making purchases with the victims' stolen credit cards." (Id. at 6.) Petitioner exhausted this claim in state court on direct appeal, where he argued that "the strongest evidence against him was the 'flimsy and unreliable testimony of the jailhouse informants,' which [he] asserts [was] uncorroborated and taken in violation of Massiah v. U.S., 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964)." State v. Churchwell, 2013 WL 430118, at *4.

As noted by the Tennessee Court of Criminal Appeals in addressing this claim, id. at *6, the governing standard when the sufficiency of the evidence supporting a conviction is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The Supreme Court has "made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). First, because it is the responsibility of the jury, not the court, to decide what conclusions should be drawn from the evidence, the reviewing state court on direct appeal "may set aside the jury's verdict on the ground

of insufficient evidence only if no rational trier of fact could have agreed with the jury." Id. (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011)). Second, a federal habeas court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court," but may only do so if the state court's decision was objectively unreasonable. Id.

Here, the Tennessee Court of Criminal Appeals concluded that the evidence was sufficient to support Petitioner's convictions, as follows:

> Viewed in the light most favorable to the State, the evidence showed that the victims both died of gunshot wounds to the head, and the victims' credit cards were taken from them. Two inmates testified that, while incarcerated with Defendant, Defendant confessed that he and two others shot the victims and stole their credit cards. The jury accredited those witnesses. In recounting Defendant's confession, both witnesses were able to provide information that the police had not released to the media or the public. Defendant's cell phone records showed that Defendant was in the area where the murders occurred. George Cody, who Defendant stated was involved in the murders, left DNA at the scene and on the murder weapon. The murder weapon and the victim's credit cards and IDs were recovered from Cody's home. Forensic testing showed that the .380 semi-automatic handgun taken from Cody's home was consistent with the weapon that fired the projectiles recovered from the victims' bodies. Defendant told detectives that he was in Antioch at the time of the murders, but Defendant's cell phone records showed that he was in the area of the murders when the murders occurred. We conclude that the evidence was sufficient to support Defendant's convictions. Defendant is not entitled to relief on this issue.
>
> Defendant also argues that the evidence was insufficient to establish the corpus delicti of the crime because the State presented no corroborating evidence of Defendant's admissions to the jailhouse informants. The corpus delicti of a crime may not be established by a confession alone. Ashby v. State, 124 Tenn. 684, 139 S.W. 872 (1911). The corpus delicti of a crime requires that the state prove two elements: (1) that a certain result has been produced, and (2) that the result was created through criminal agency. State v. Ervin, 731 S.W.2d 70, 71–72 (Tenn.Crim.App. 1986). The elements of corpus delicti may be established by circumstantial evidence. Id. at 72. Furthermore, the question of whether the state has sufficiently proven the corpus delicti is a question for the jury. Id. at 71. "Only slight evidence of the corpus delicti is necessary to corroborate a confession and thus sustain a conviction." Id. at 72 (emphasis added).

> There was more than sufficient evidence to establish the corpus delicti in this case. The direct evidence that a crime was actually committed in this case includes the victims' bodies and their cause and manner of death. Dr. Romero heard gunshots, and the victims were found shot to death. Evidence was also presented that the victims' credit cards were taken and used after their deaths. This is not a case in which the only proof that a crime was committed derived from the defendant's confessions alone. Here, the evidence that a crime occurred sufficiently corroborates Defendant's confessions. Defendant is not entitled to relief on this issue.
>
> Defendant also asserts that any incriminating statements made to his fellow inmates were elicited in violation of Massiah v. U.S., 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). . . . We recognize "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). Thus, in order to find a Massiah violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of Massiah. We note that Defendant clearly had been formally charged and adversary proceedings had commenced at the time he made statements to Jones and Jenkins. Defendant was incarcerated following his arrest. However, there is no evidence that detectives enlisted Jones or Jenkins to obtain statements from Defendant or that the informants deliberately elicited incriminating statements from Defendant. Defendant is not entitled to relief on this issue.

State v. Churchwell, 2013 WL 430118, at *6–7.

Viewing these findings through the lens of AEDPA, it is clear that the Tennessee Court of Criminal Appeals correctly applied Jackson and reached a conclusion that was reasonable in light of the evidence presented at Petitioner's trial. Specifically, the court reasonably concluded that there was sufficient evidence for a rational juror to find that Petitioner was in the area of Dr. Colas's home on the night of the murders, and that he confessed to the crimes and revealed his knowledge of previously undisclosed information to the two inmate witnesses, Andrew Jones and Jermaine Jenkins. Given the evidence and testimony presented, a rational juror could have found that Petitioner planned the robbery of Dr. Colas with George Cody, and that Petitioner fired the shots that killed the victims before handing the gun off to Cody. The state court's determination that the

evidence was sufficient to support these findings was not "objectively unreasonable," and Petitioner has not met the high bar to overcome that determination in this federal habeas proceeding. See Coleman, 132 S. Ct. at 2062; see also Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009) ("[E]ven were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."). Petitioner is not entitled to relief on this claim.

### B. Ineffective Assistance Claims

#### 1. Standard Applied in State Post-Conviction

Petitioner next claims that the Tennessee Court of Criminal Appeals applied an incorrect standard to his post-conviction claims of ineffective assistance of trial counsel. He appears to believe that the court's citation to the statutory, "clear and convincing evidence" standard for proving the factual allegations of the post-conviction petition, see Tenn. Code Ann. § 40-30-110(f), conflicted with its application of the standard for establishing ineffective assistance under Strickland v. Washington, 466 U.S. 668, 687–88 (1984). He argues that this error prevented the Court of Criminal Appeals from appreciating that he was prejudiced when trial counsel failed to move to suppress evidence obtained in an unlawful search of his room in his mother's house. (Doc. No. 1 at 8–9.)

In Strickland, the Supreme Court established a two-part test to evaluate whether counsel has been constitutionally ineffective in violation of the criminal defendant's Sixth Amendment rights. This test requires the movant to prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." Strickland, 466 U.S. at 688–89, 694. Courts do not

15

need to address both components of this test if the movant makes an insufficient showing on one. Id. at 697. The Strickland standard sets a high bar that is not easily surmounted. Padilla v. Kentucky, 559 U.S. 356, 371 (2010). Courts "must indulge a strong presumption" that counsel's assistance was effective; the movant bears the burden of overcoming the presumption that counsel's acts or omissions might be considered sound strategy. Strickland, 466 U.S. at 689–90.

The Tennessee Court of Criminal Appeals, in citing the applicable statutory burden of proof for establishing factual allegations on post-conviction review, did not elevate the requirements of the Strickland inquiry into deficient performance and resulting prejudice. See Howell v. Hodge, No. 2:06-cv-108, 2010 WL 1252201, at *13 (E.D. Tenn. Mar. 24, 2010), aff'd, 710 F.3d 381 (6th Cir. 2013) ("The 'clear and convincing' evidence rule is drawn from state law and applies to factual allegations—not legal determinations, such as whether there is a reasonable probability that an outcome would be different."). It simply recited Petitioner's burden of proof in the post-conviction trial court—the factfinder in the post-conviction process—before stating that "the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Churchwell v. State, 2016 WL 5253203, at *3. The state court then analyzed, by reference to Strickland, whether Petitioner had met his "burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Id. at 4. It did not require Petitioner to prove these elements by clear and convincing evidence. Cf. Bryant v. Westbrooks, No. 3:15-0685, 2018 WL 4210784, at *13 (M.D. Tenn. Sept. 4, 2018), report and recommendation adopted, No. 3:15-cv-00685, 2018 WL 5255281 (M.D. Tenn. Oct. 22, 2018) (finding state court decision contrary to clearly established federal law where it "consistently referred to Petitioner's failure to prove deficiency itself by clear and convincing evidence" instead of limiting that burden of proof to factual allegations).

The Court of Criminal Appeals correctly cited and applied Strickland, finding no grounds for holding trial counsel's performance deficient. Again, having stated that the post-conviction trial court's findings of fact are presumed correct unless the evidence preponderates against them, the court resolved the dispute over counsel's allegedly deficient communication and preparation by deferring to the trial court's determination that counsel was the more credible witness at the evidentiary hearing. Churchwell, 2016 WL 5253203, at *3–4. The court otherwise determined that Petitioner failed to demonstrate deficient performance because he failed to offer pertinent proof at the evidentiary hearing, including any proof of Petitioner's claim that "the police had obtained information from a cellular telephone for which they did not have a warrant[.]" Id. at *4. These determinations are in keeping with the Sixth Circuit's observation that, "[i]n essence, a [petitioner] has the burden of proving [ineffective assistance] by a preponderance of the evidence." Higgins v. Renico, 470 F.3d 624, 632 (6th Cir. 2006). This Court therefore finds that the state courts did not unreasonably apply Strickland's principles to the facts of Petitioner's case, nor did they unreasonably determine those facts in light of Petitioner's proof (or lack thereof) at the evidentiary hearing.

### 2. Defaulted Ineffective Assistance Claims

Petitioner raises two additional claims of ineffective assistance of trial counsel before this Court, both of which he concedes he did not raise in state court. (Doc. No. 1 at 9.) First, he claims that trial counsel was ineffective in failing to make a contemporaneous objection to the testimony of fellow inmates Andrew Jones and Jermaine Jenkins. (Id. at 9, 14–18.) Second, he claims that counsel was ineffective in failing to move for a mistrial based on the jury's finding that he is guilty of both felony murder and criminally negligent homicide, which are "mutually exclusive, legally inconsistent verdicts that violate double jeopardy." (Id. at 9, 18–20.) Petitioner argues that his

17

procedural default of these claims should be excused under Martinez v. Ryan, 566 U.S. 1 (2012), because it resulted from his post-conviction counsel's ineffectiveness in failing to raise these claims in the post-conviction trial court. (Id. at 10–13.)

However, as Respondent points out, to excuse this default under Martinez, Petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the [petitioner] must demonstrate that the claim has some merit." 566 U.S. at 14. This, Petitioner cannot do.

On direct appeal, the Tennessee Court of Criminal Appeals rejected Petitioner's underlying claim that "any incriminating statements made to his fellow inmates were elicited in violation of Massiah," denying relief because "there is no evidence that detectives enlisted Jones or Jenkins to obtain statements from Defendant or that the informants deliberately elicited incriminating statements from Defendant." State v. Churchwell, 2013 WL 430118, at *7. In the absence of such evidence, trial counsel did not have grounds for objecting to the admission of testimony from these inmates under Massiah, and therefore cannot be found to have rendered deficient performance under Strickland. See Bailey v. Smith, 492 F. App'x 619, 627 (6th Cir. 2012) (finding that counsel's failure to object did not violate Strickland "[b]ecause neither logic nor precedent indicate that objecting without cause amounts to effective advocacy").

Moreover, with regard to the claim that trial counsel should have moved for a mistrial on the basis of the jury's inconsistent, mutually exclusive guilty verdicts, neither the record below nor Tennessee law provides support for such an outcome. First, it is clear that the trial court merged the convictions for criminally negligent homicide into the convictions for felony murder (Doc. No. 17-1 at 38, 40) and imposed sentence based on the felony murder convictions. (Id. at 39, 41.) Because Petitioner was sentenced only on his felony murder convictions, any potential double

jeopardy violation was cured by this merger. See State v. Davis, 466 S.W.3d 49, 77 (Tenn. 2015) ("[N]o principles of double jeopardy were offended when the jury convicted the Defendant of reckless homicide on the second count of the indictment because the trial court properly merged the reckless homicide conviction into the second degree murder conviction.").

Second, relief is not justified based on any inconsistency or mutual exclusivity between the verdicts for felony murder and criminally negligent homicide. Petitioner asserts that "[b]ecause the jury found [him] guilty of criminally negligent homicide they could not find him guilty of felony murder [based] on the same conduct." (Doc. No. 1 at 20.) However, in Davis, the Tennessee Supreme Court considered inconsistent jury verdicts convicting the defendant of both a knowing killing and a reckless killing in one criminal action, and reaffirmed its "longstanding position of honoring and respecting a jury's verdicts, even when they are inconsistent." Id. at 76–77 (citing Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973)). The Davis court made clear that it was not inclined to move from this position simply because the inconsistent verdicts might also be termed "mutually exclusive," noting the pitfalls of "trying to parse a jury's inconsistent verdicts" to determine whether one verdict excluded the possibility of the other, and declining to join "the few jurisdictions that grant relief on the basis of 'mutually exclusive' verdicts." Id. at 77. Likewise, federal courts hold that inconsistent verdicts are not a basis for relief from judgment. E.g., United States v. Powell, 469 U.S. 57, 64–69 (1984) (finding "no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled," in part because "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence" and "further safeguards against jury irrationality are [un]necessary"). Because trial counsel had no grounds to seek a mistrial based on merged verdicts that are

inconsistent or mutually exclusive, his failure to do so cannot amount to ineffective assistance. Bailey, 492 F. App'x at 627.

In short, Petitioner cannot demonstrate that his underlying ineffective-assistance-of-trial-counsel claims are substantial. Accordingly, even if his post-conviction attorney's failure to raise these claims constituted deficient performance, Petitioner would not be entitled to further review of their merits in this Court. Martinez, 566 U.S. at 14.

## VI. Conclusion

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

When the district court denies a ground for relief on the merits in a habeas corpus action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of the denial of a constitutional right with respect to any ground for relief asserted in the petition, a COA will not issue.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE